**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GIDEON A. UZOMECHINA, <br><br> Plaintiff, <br><br> v. <br><br> EPISCOPAL DIOCESE OF NEW JERSEY, *et al.*, <br><br> Defendants. | Civil Action No. 23-2914 (MAS) (TJB) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

  This matter comes before the Court upon Defendants Episcopal Diocese of New Jersey ("Diocese"), Bishop William Stokes ("Bishop Stokes"), and Canon Brian Jemmott's ("Canon Jemmott") (collectively, "Diocese Defendants") Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure[1] 12(b)(6). (ECF No. 7.) Defendants Recovery Centers of America, Inc. ("RCA") and Christopher Reeves ("Reeves") (collectively, "RCA Defendants")[2] joined the Motion to Dismiss. (ECF No. 8.)[3] Plaintiff opposed the Motion (ECF No. 14), and the Diocese Defendants replied (ECF No. 18). The Court has considered the parties' submissions and

---

[1] All references to "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

[2] The Court refers to the Diocese Defendants and RCA Defendants collectively as "Defendants."

[3] The RCA Defendants filed additional correspondence on October 26, 2023 (ECF No. 16), asserting that (1) Plaintiff's opposition brief should be disregarded as untimely (*id.* at 2-3); and (2) Plaintiff fails to state a claim upon which relief can be granted (*id.* at 3-4 (citing Fed. R. Civ. P. 12(b)(6))).

decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons stated herein, Defendants' Motion to Dismiss is granted.

I.  **BACKGROUND**

The Diocese represents "the central office of the Episcopal Church" and is located in Trenton, New Jersey. (Compl. ¶ 2, ECF No. 1.) Plaintiff was recruited by the Diocese at or around December 2010, and entered an employment contract to "work as a priest at St. Alban's Church in New Brunswick, New Jersey." (*Id.* ¶¶ 12-13.) In this capacity, Plaintiff successfully brought those struggling with drug and alcohol addiction, as well as young men involved in gang activity, to St. Alban's Church. (*Id.* ¶¶ 14-15.) Considering Plaintiff's contributions to St. Alban's Church, the Diocese later assigned Plaintiff to work on the expansion of the Grace Episcopal Church in Plainfield, New Jersey (*Id.* ¶ 16.) Plaintiff, an African American male of Nigerian descent, accepted the assignment to Grace Episcopal Church, allegedly not knowing that the "spiritual foundation of the church was laid on racism." (*Id.* ¶ 17.) Plaintiff asserts that, despite being exposed to a "hostile and toxic work environment" at Grace Episcopal Church, he continued to fulfill his pastoral duties and positively contribute to the community. (*Id.* ¶ 18.)

At an unspecified point in time, the Diocese accused and charged Plaintiff of engaging in financial and sexual misconduct in violation of Title IV of the Canons of the Law of the Diocese.[4] (*Id.* ¶¶ 19, 23.) Plaintiff claims that the Diocese Defendants launched "false allegations" thereafter

---

[4] The underlying cause of the accusations are not clear. The Complaint, however, explains that the Diocese had contacted two Nigerian male students who were visiting the United States on student visas. (Compl. ¶ 24.) The students asked Plaintiff to help them file for asylum through Grace Episcopal Church, a church that welcomes the LGBTQ community, "so they could get their [p]ermanent [r]esident [c]ards quickly." (*Id.* ¶ 25.) Plaintiff allegedly denied assisting the students because they informed him that they were "not actually gay." (*Id.* ¶ 26.)

2

in an effort to have Plaintiff removed from the Diocese. (*Id.* ¶¶ 23-29.) Plaintiff was subsequently dismissed from the Diocese. (*Id.* ¶ 27.)

Plaintiff was later hired by RCA, a drug and rehabilitation center in Plainfield, New Jersey, as a "Spiritual Counselor" to assist men and women with substance abuse issues. (*Id.* ¶¶ 4, 31.) Once he was employed, however, Plaintiff alleges that the Diocese and Bishop Stokes "published false statements" about Plaintiff to RCA and "with reckless disregard for the truth of [his] character and reputation." (*Id.* ¶ 30.) RCA, in turn, is alleged to have "wrongfully discharged and discriminated against [Plaintiff] based on his race." (*Id.* ¶ 32.)

On May 29, 2023, Plaintiff filed a six-count Complaint against the Diocese Defendants and RCA Defendants. (ECF No. 1.) Plaintiff asserts claims of: (1) race discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981") (Count One); (2) race discrimination under the New Jersey Law Against Discrimination ("NJLAD") (Count Two)[5]; (3) defamation (Count Three); (4) breach of contract (Count Four); (5) breach of implied covenant of good faith and fair dealing (Count Five); and (6) wrongful discharge in violation of public policy (Count Six). (Compl. at 7-13.) The Diocese Defendants responded to the Complaint by filing the instant Motion to Dismiss.[6] (ECF No. 7.)

## II. LEGAL STANDARD

A district court conducts a three-part analysis to determine whether a motion to dismiss should be granted under Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First,

---

[5] The NJLAD claim (Count Two) is only brought against the RCA Defendants. (*See* Compl. ¶¶ 43-50.)

[6] On July 21, 2023, the RCA Defendants filed correspondence requesting to be joined on the Motion and seeking dismissal of the claims against them on the same grounds presented therein. (ECF No. 8.)

the court must be able to identify "the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must identify and accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). In doing so, the court will discard bare legal conclusions or factually unsupported accusations. *Iqbal*, 556 U.S. at 678 (citing *Twombly v. Bell Atl. Corp.*, 550 U.S. 544, 555 (2007)). Third, the court determines whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 210-11 (quoting *Iqbal*, 556 U.S. at 679). If the claim is facially plausible and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," a motion to dismiss will be denied. *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). If, however, the claim does not "allow[] the court to draw a reasonable inference that the defendant is liable for the misconduct alleged," a motion to dismiss will be granted. *Id.* On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## III. DISCUSSION

### A. Claims Against the Diocese Defendants

The Diocese Defendants contend that Plaintiff's claims are barred by the "ministerial exception" to the First Amendment of the United States Constitution. (Diocese Defs.' Moving Br. *7-13[7].) The United States Supreme Court recently described the ministerial exception as follows:

> The First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Applying this principle, [the Supreme Court] held in *Hosanna-Tabor*

---

[7] Page numbers preceded by an asterisk refer to the page numbers atop the ECF header.

4

> *Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, that the First Amendment barred a court from entertaining an employment discrimination claim brought by [a] teacher against the religious school where she taught. [This] decision built on a line of lower court cases adopting what was dubbed the "ministerial exception" to laws governing the employment relationship between a religious institution and certain key employees.

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (internal quotations and citations omitted).

In short, the Supreme Court stated that: "[u]nder this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.* at 2060. The exception bars claims that would entangle the state in a religious institution's employment of its ministers, or those "who perform[] particular spiritual functions on [the institution's] behalf." *Petruska v. Gannon Univ.*, 462 F.3d 294, 307 (3d Cir. 2006); *see also Hosanna-Tabor*, 565 U.S. at 171.

Here, Plaintiff does not dispute that he was employed by the Diocese as a "minister." (*See, e.g.*, Compl. ¶ 12 (stating that Plaintiff was recruited to "work as a priest" at St. Alban's Church); *id.* ¶ 18 (stating that Plaintiff gave sermons and conducted bible study at Grace Episcopal Church)).[8] At issue is whether the ministerial exception bars all of Plaintiff's claims against the Diocese Defendants.

> i. *Employment Discrimination Claims (Counts One and Six)*

The Diocese Defendants contend that the ministerial exception applies to employment discrimination disputes between the ministerial employees and their religious institution employers. (Diocese Defs.' Moving Br. *7-13.) The Diocese Defendants, therefore, move to

---

[8] Plaintiff does not dispute that he served in the capacity as a minister. (*See* Pl.'s Opp'n Br. 6 (noting that Plaintiff signed employment agreements with the Diocese "to serve as a pastor . . . .")

5

dismiss Plaintiff's claims under Section 1981[9] (Count One) and for wrongful discharge[10] (Count Six). Plaintiff disagrees and argues that the exception applies only to employment discrimination claims based on *tangible* adverse employment actions and would not apply to other *non-tangible* employment discrimination claims, such as hostile work environment[11] claims. (Pl.'s Opp'n Br. 11-13.)

There is no question, and Plaintiff does not appear to dispute that, "the 'ministerial exception' [applies] to laws governing the employment relationship." *Our Lady of Guadalupe*, 140 S. Ct. at 2055. This includes statutory employment discrimination claims. *Hosanna-Tabor*, 565 U.S. at 188; *see also Melendez v. Kourounis*, No. A-0744-16T1, 2017 WL 6347622, at *4 (N.J. Super. Ct. App. Div. Dec. 13, 2017) ("Courts may consider LAD claims against religious institutions 'only when the underlying dispute does not turn on doctrine or polity.'" (quoting *Gallo v. Salesian Soc'y*, 290 N.J. Super. 616, 631 (N.J. Sup. Ct. App. Div. 1996)) (internal brackets

---

[9] Specifically, under Count One, Plaintiff contends that "Defendants have violated Section 1981" by discriminating and "retaliating against [him,] and unlawfully suspending [Plaintiff] from [his] employment." (Compl. ¶ 40.)

[10] Plaintiff's wrongful discharge claim mimics the Section 1981 claim and asserts that the Diocese Defendants "unlawfully terminated Plaintiff in retaliation for seeking to protect his rights under New Jersey Law" and in wrongfully applying the Diocese's "own policies and procedures." (Compl. ¶¶ 71-76.)

[11] In a separate paragraph, under "factual allegations," Plaintiff alleges that he continued to carry out his pastoral responsibilities with Grace Episcopal Church notwithstanding "such a toxic and hostile work environment." (Compl. ¶ 18.) Plaintiff does not, however, plead a claim of "hostile work environment" as a claim within the Counts of his Complaint. (*Id.* at 7-13.) Construing the Complaint in a light most favorable to Plaintiff, the Court will consider the viability of a hostile work environment claim within the penumbras of his Section 1981 claim. (*See id.* ¶ 36 (noting that "Defendant has unfairly punished, harassed, intimidated and retaliated against Plaintiff because of his race.").); *see also Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 653 (E.D. Pa. 2012), *aff'd*, 565 F. App'x 88 (3d Cir. 2014) (noting that the elements of a hostile work environment claim under Section 1981 are the same as a Title VII claim except the first element requires intentional discrimination because of race).

6

omitted); *Fassl v. Our Lady of Perpetual Help Roman Cath. Church*, No. 05-404, 2005 WL 2455253, at *10 (E.D. Pa. 2005) (applying the ministerial exception to FMLA claim because "the Court finds no logic or legal argument to distinguish the Free Exercise Clause principle upon which the 'ministerial exception' is based with regard to an application of that rule to some laws proscribing employment discrimination but not to others").

Plaintiff, nevertheless, urges the Court to follow a non-controlling and since-vacated decision, *Demkovich v. St. Andrew the Apostle Parish*, which determined that "[t]he right balance is to bar claims by ministerial employees challenging tangible employment actions." 973 F.3d 718, 720, 727-731 (7th Cir. 2020). Yet, in interpreting *Hosanna-Tabor* and *Our Lady of Guadalupe*, the Seventh Circuit found that the Supreme Court did not create a "categorical bar" to a non-tangible sexual hostile work environment claim. *Id.*[12]

In the absence of the *Our Lady of Guadalupe* decision, the Court may have been inclined to assess, as the *Demkovich* court did, the correct balance of cases to which the ministerial exception applies. As the Diocese Defendants point out, however, the Supreme Court did not limit the ministerial exception to tangible or intangible employment actions. *Id.*

Indeed, other courts have found that the ministerial exception applies to non-tangible employment discrimination claims, including hostile work environment claims. *See, e.g.*,

---

[12] *Demkovich* determined that the ministerial exception to non-tangible employment discrimination claims was not "necessary" under the First Amendment's Free Exercise Clause since "[t]he ministerial exception ensures that religious organizations are able to 'select and control' their ministers without interference from civil law like employment discrimination statutes . . . [and] that purpose can be accomplished by applying the ministerial exception to all tangible employment actions." *Id.* at 727 (citations omitted). In other words, "giving "[r]eligious employers[] control over tangible employment actions—hiring, firing, promoting, deciding compensation, job assignments and the like—provides ample protection for the free exercise of religion." *Id.* at 720, 727. Whereas claims based on intangible employment actions, such as discriminatory remarks and insults, were not necessarily protected. *Id.* at 720.

*Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010) (finding that any Title VII claim, including hostile work environment, would implicate church's spiritual functions and the courts cannot decide such claims without improperly interfering with church's protected rights); *Preece v. Covenant Presbyterian Church*, No. 13-188, 2015 WL 1826231, at *17-19 (D. Neb. Apr. 22, 2015) (finding that a ministerial employee's sexual harassment claim was barred by the ministerial exception and "[t]he type of claim is irrelevant because any Title VII action brought against a church by one of its ministers will improperly interfere with the church's right to select and direct its ministers free from state interference" (internal quotations and citations omitted)); *Ogugua v. Archdiocese of Omaha*, No. 07-471, 2008 WL 4717121, at *5 (D. Neb. Oct. 22, 2008) (finding that a ministerial employee's sexual harassment claim was barred by the ministerial exception because the claim was intertwined with adverse employment actions, which could not be reviewed by the court without excessive government entanglement with religion in violation of the First Amendment). The Court finds that these cases are persuasive and align more closely with the Supreme Court's precedent and analysis in *Our Lady of Guadalupe*. *See* 140 S. Ct. at 2064 (finding that the exception grants broad authority "to select, supervise, and if necessary, remove a minister without interference by secular authorities.").

The Court, therefore, dismisses Plaintiff's claims under Section 1981 (Count One) and for wrongful discharge (Count Six) of the Complaint, as these claims directly implicate the employment relationship between the religious institution and its ministerial employee. *Id.* at 2055.

      *ii.*    *Defamation (Count Three)*

Next, Plaintiff contends that his defamation claim (Count Three) would not be precluded by the ministerial exception. (Pl.'s Opp'n Br. 13-14.) In response, the Diocese Defendants rely on

8

a recent decision of the New Jersey Appellate Division[13] which assessed whether the ministerial exception only bars employment-related claims or if the exception also encompasses tort claims, such as defamation. (Diocese Defs.' Moving Br. *10 (citing *Hyman v. Rosenbaum Yeshiva of North Jersey*, 289 A.3d 826, 828 (N.J. Super. Ct. App. Div.), *cert. granted*, 255 N.J. 419 (2023).)

In *Hyman*, the plaintiff was hired as a teacher at Rosenbaum Yeshiva of New Jersey ("RYNJ"), an Orthodox Jewish school, where he taught Judaic studies. 289 A.3d at 828. The RYNJ Staff Handbook required teachers, particularly those who teach Orthodox Jewish religious law and practices, "to conform to the school's religious principles, such as refraining from touching students of the opposite gender that are in the third grade or older." *Id.* at 829. In February 2019, RYNJ learned of allegations regarding inappropriate interactions between the plaintiff and former female students. *Id.* RYNJ later terminated the plaintiff's employment after an internal investigation revealed that the plaintiff's conduct violated the Orthodox Jewish standards of conduct outlined in the RYNJ Staff Handbook. *Id.* The RYNJ issued a letter to the parents of students advising that an investigation had determined the plaintiff's conduct was neither acceptable nor consistent with the school's principles of how teachers should interact with students. *Id.* The letter was disseminated throughout the RYNJ community and other Jewish communities, which the plaintiff alleged prevented him from securing future employment in education. *Id.* at 830.

The plaintiff filed a complaint against RYNJ asserting many of the same causes of action presented in this case, including breach of contract, discrimination under the NJLAD, and

---

[13] "In a federal question case such as this, a district court entertaining pendant state claims should follow the choice of law rules of the forum state." *Talbot v. United States*, No. 05-768, 2005 WL 2917463, at *4 (D.N.J. Oct. 28, 2005) (citation omitted); *accord Tantillo v. Citifinancial Retail Servs.*, No. 12-511, 2013 WL 622147, at *7 n.5 (D.N.J. Feb. 19, 2013). Accordingly, the Court applies New Jersey state law to the claims presented here.

defamation. *Id.* The complaint alleged that RYNJ conducted a "sham investigation" into "baseless allegations." *Id.* The plaintiff further alleged that based on the sham investigation, "RYNJ wrongfully terminated him, maliciously emailed the letter to the community, and falsely branded him as a pedophile . . . ." *Id.* The defendants moved to dismiss the complaint in its entirety for failure to state a claim because **plaintiff's claims were barred by the ministerial exception.** *Id.*

The Appellate Division noted that there was no published case in New Jersey addressing whether the ministerial exception applies to cases beyond employment discrimination claims. *Id.* at 835. In reviewing persuasive cases from other jurisdictions, the court deemed that "plaintiff's defamation claims [were] 'part and parcel' and connected to RYNJ's decision to terminate him." *Id.* at 838 (citing various cases). In other words, the Appellate Division found that the defamation claims were properly dismissed because the claims arose from actions and communications made in connection with RYNJ's decision to terminate the plaintiff from a ministerial position. *Id.* The Appellate Division went on to create its own standard for cases involving similar claims, stating that "the ministerial exception operates to bar any tort claim provided (1) the injured party is a minister formerly employed by a religious institution and (2) the claims are related to the religious institution's employment decision." *See id.* at 828.

The Diocese Defendants request that this Court consider *Hyman* as persuasive authority and dismiss Plaintiff's tort-based claims under the ministerial exception. (Diocese Defs.' Moving Br. *10-13.) While there are certain parallels between the facts of the *Hyman* decision and the case at bar, the Court declines that invitation. First, and most notably, after the filing of this Motion, the New Jersey Supreme Court granted certification of the *Hyman* decision. *Hyman*, 255 N.J. 419 (2023). As such, the precedential effect of the Appellate Division's rationale in *Hyman* remains uncertain. Second, as a matter of substance, the Court is not convinced that the criteria established

10

by *Hyman* and the wide range of tort-related allegations that could fall under its purview align with the principles of the First Amendment.

As all sides agree, the Supreme Court has yet to provide a bright line rule governing the question of whether tort claims brought by current or former members of religious organizations that allegedly defame or ostracize them would be barred by the First Amendment. *See Hosanna-Tabor*, 565 U.S. at 196 ("[w]e express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers."). State and federal courts alike have been tasked with filling this gap. In reviewing the relevant case law, this Court did not find any cases within this district that have evaluated this narrow inquiry. This Court accordingly draws upon a number of cases from courts in other jurisdictions and has derived some general principles that inform its analysis of the Diocese Defendants' First Amendment defense in the context of this case.

The first well-accepted principle is that courts generally do not permit tort claims arising from internal processes upon which religious organizations discipline their members or determine whether a person's character renders him or her suitable for continued membership or participation in the organization. The Minnesota Court of Appeals, for example, held that a couples' claim for defamation against their former pastor who had read a letter to the entire congregation of his church stating the reasons for terminating the couple's membership was barred by the First Amendment— even as to statements that were ostensibly unrelated to church doctrine. *Schoenhals v. Mains*, 504 N.W.2d 233, 234-36 (Minn. Ct. App. 1993). Likewise, in *C.L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389 (Tex. 2007), the Supreme Court of Texas concluded that the First Amendment barred tort claims brought by a former member of a church against the church's pastor and other church officials after they disseminated a letter to the church congregation that revealed confidential

11

information gleaned by the pastor during counseling sessions. *Id.* at 393, 405. Further, the Ohio Court of Appeals held that a defamation claim premised on church members or officials having stated that the plaintiff "had lied, that he was in league with Satan, . . . and that he had been 'sleeping around,'" was barred by the First Amendment because the statements arose out of an underlying dispute between him and the church as part of an effort to remove his church membership and were made during a church meeting. *Howard v. Covenant Apostolic Church, Inc.*, 705 N.E.2d 385, 388-89 (Ohio Ct. App. 1997). Indeed, permitting individuals aggrieved by a religious organization's internal ecclesiastical administration to adjudicate such claims in civil court would inherently subvert the right of religious bodies to exercise religious freedom. *See Watson v. Jones*, 80 U.S. 679, 729 (1871).

The second principle relevant here is that some courts have found that the First Amendment bars tort claims that arise from circumstances in which a plaintiff has been ostracized from a religious community—a practice known, formally in some religions, as "shunning."[14] The Ninth Circuit, for example, has held that allowing a plaintiff to pursue tort claims against a religious organization based on shunning practices would effectively abridge the free exercise of religion under the First Amendment. *See Paul*, 819 F.2d at 879 (finding that tort damages against Jehovah's Witnesses for engaging in the religious practice of shunning would essentially criminalize and force the church to forego the practice, thereby imposing a direct burden on religion); *see also Sands v. Living Word Fellowship*, 34 P.3d 955, 956, 959 (Alaska 2001) (barring, among other tort

---

[14] "Shunning" is a form of ostracism that forbids contact with "disfellowshiped persons." *See Paul v. Watchtower Bible & Tract Soc.*, 819 F.2d 875, 876 (9th Cir. 1987). A "[d]isfellowshiped person" is a former member who has been excommunicated from the church. *Id.* This practice has early roots in Christianity, and is practiced by various religious groups, including the Amish, Mennonites, and Jehovah's Witnesses. *Id.*

claims, plaintiff's claims of defamation arising out of a church's disfellowship or practices of "shunning"). These cases align more closely with *Hyman, supra*, 289 A.3d at 830 (noting that defendants disseminated a letter throughout the Judaic school and similar Jewish communities damaging his reputation "among the Jewish community."). This Court, however, takes no view as to whether tort-related claims for shunning-related practices are entitled to protection under the First Amendment.[15]

The third principle, which is particularly relevant to this case, is the recognition by some courts to draw a distinction between circumstances in which defamatory comments are published exclusively to the members of a religious organization and circumstances in which defamatory comments are published, as well, to the general community. *See, e.g., Kliebenstein v. Iowa Conf. of United Methodist Church*, 663 N.W.2d 404, 405-07 (Iowa 2003) (finding that a minister's letter describing the plaintiff as the "spirit of Satan", which was disseminated to members of the community who were not affiliated with the church, "weaken[ed] [the] ecclesiastical shield" because the protections afforded in this context "may be lost upon proof of excess publication or publication 'beyond the group interest'"); *Lipscombe v. Crudup*, 888 A.2d 1171, 1173 (D.C. 2005) (finding that the First Amendment does not bar a church member's defamation claim against a pastor, in part because the member's allegation "that the statement was made 'to the public in an open meeting' sufficiently alleged that others besides church members were present," and his affidavit "asserted explicitly that '[t]he public gathering was not part of any church service and members from the public, including accountants, heard the [s]tatement.'"); *Ausley v. Shaw*, 193 S.W.3d 892, 896 (Tenn. Ct. App. 2005) (holding First Amendment did not bar minister's slander

---

[15] Nor is "shunning" or "disfellowship" an issue presented in this case.

13

claim because statements "were made in the presence of Church members, local law enforcement, and members of the surrounding community").

The issue here is whether the First Amendment prohibits courts from hearing a defamation claim against Defendants who distributed statements to non-church members or members of the general public (i.e. the RCA Defendants). *Hyman* appears to answer that question in the affirmative—finding that the ministerial exception "operates to bar *any tort claim* provided (1) the injured party is a minister formerly employed by a religious institution and (2) the claims are related to the religious institution's employment decision." 289 A.3d at 828.

This Court, however, is not convinced that the ministerial exception was intended to cast such a wide net. Rather, if publication solely to church members or those within a congregation bolsters a statement's ecclesiastical status for a statement that would otherwise constitute a defamatory communication, it follows logically that proof of publication to *non-church members* must implicate the opposite conclusion. Put in another way, "[i]t is one thing to say that churches must be free of governmental interference to conduct matters of *internal discipline and organization*, even when those matters touch upon the reputations of those effected." *In re Diocese of Lubbock*, 624 S.W.3d 506, 529-30 (Tex. 2021) (quoting *Hayden v. Schulte*, 701 So. 2d 1354, 1356-57 (La. Ct. App. 1997)). But it is "quite another to say that churches have the unfettered right to make unsubstantiated statements of an essentially secular nature to [the general public] destructive of a priest's character." *Id.* (citing *Hayden*, 701 So. 2d at 1357).

Consistent with other courts across the country and applying the foregoing principles to the facts alleged here, this Court finds that by sharing its internal disciplinary procedures and beliefs with a secular third-party, i.e. the RCA Defendants, the Diocese Defendants subjected itself to the laws that govern the public realm. In other words, exercising jurisdiction over Plaintiff's

claim will not second-guess or threaten the Diocese Defendants' decisions to investigate its clergy, find misconduct by a clergy member, or impose internal disciplinary measures against a member of the church. What it will threaten is a religious organization's ability to make false and defamatory statements about its clergy or members to the general public, outside of the organization's internal operations. The ministerial exception, therefore, is not applicable to Plaintiff's defamation claims.[16]

The Court, nevertheless, dismisses Count Three of the Complaint, without prejudice, for failure to state a claim. Construing the allegations in the Complaint in a light most favorable to Plaintiff, Plaintiff merely states that the "Diocese [Defendants] and Bishop Stokes knowingly published false statements about [Plaintiff] to [the RCA Defendants] and others with reckless disregard for the truth of [Plaintiff's] character and reputation." (Compl. ¶ 30.) Without more, this constitutes a "mere recitation of the elements of defamation rather than a description of the facts underlying the claim." *Desire v. Dreamwear Inc.*, No. 21-16178, 2022 WL 408956, at *6 (D.N.J. Feb. 10, 2022); *see also Iqbal*, 129 S. Ct. at 1949 ("A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertions' devoid of further factual enhancement.") (citations omitted). And, while Plaintiff identifies the recipients of the Diocese Defendants' allegedly defamatory statements, Plaintiff does not allege when the statements were made or any facts concerning the alleged false and defamatory statements. *See Alexander v. Hackensack Meridian Health*, No. 19-18287, 2020 WL 5810526, at *10 (D.N.J. Sept. 30, 2020) (dismissing plaintiffs' defamation

---

[16] The Court recognizes that the viability of the Appellate Division's approach in *Hyman* is currently pending before the New Jersey Supreme Court. If the New Jersey Supreme Court issues its decision over the course of these proceedings and affirms *Hyman*'s approach, the Diocese Defendants will be granted leave to file a renewed Motion to Dismiss at that time.

15

claim for, *inter alia*, failing to allege when the statement was made). As pled, Plaintiff's claim for defamation (Count Three) is "not enough to pass muster." *Desire*, 2022 WL 408956, at *6. Count Three is dismissed without prejudice. Plaintiff is provided thirty (30) days to file an amended complaint that cures the deficiencies stated herein.

      iii. *Breach of Contract (Count Four) and Breach of Implied Covenant of Good Faith and Fair Dealing (Count Five)*

The Court now turns to Plaintiff's contract-based claims against the Diocese Defendants under Counts Four and Five. Courts have determined that "the [ministerial] exception also applies to certain contract-based claims." *Simon v. St. Dominic Acad.*, No. 19-21271, 2021 WL 1660851, at *3 (D.N.J. Apr. 28, 2021). Contract claims may only be considered where they "'turn[] on a question devoid of doctrinal implications' and 'employ neutral principles of law to adjudicate.'" *Id.* (quoting *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 120 (3d Cir. 2018) (finding that "[a] court nonetheless must be cognizant of the ministerial exception when asked to adjudicate a contractual dispute, as a court's resolution of the dispute may involve 'excessive government entanglement with religion,' and thereby offend the Establishment Clause.")).

According to the Complaint, Plaintiff "signed a contract with the Diocese Defendants of New Jersey on or around December 2010." (Compl. ¶ 13.) He vaguely states that the Diocese Defendants breached the contract in applying "their policies and procedures." (*Id.* ¶ 68.) Like his other employment claims, Plaintiff's breach of contract claims are connected to the essential terms of his employment agreement. That is, the Diocese Defendants breached their employment agreement with Plaintiff when they removed him from the Diocese on allegations that he violated the Canons of the Church. Resolution of these issues would necessarily lead the Court into an examination of the Diocese's motives for terminating Plaintiff, a ministerial employee. Because

these matters closely turn on the church-minister employment relationship, the Court finds that the First Amendment bars adjudication of Plaintiff's breach of contract claims against the Diocese Defendants. *See McKelvey v. Pierce*, 800 A.2d 840, 858 (N.J. 2002) (finding that where an "ecclesiastically-based action clearly is present, such as the propriety of a church's choice concerning the hiring, termination, relocation, benefits, or tenure of a person whose function . . . concerns the propagation of its faith, the First Amendment shields the religious organization from suit."). Plaintiff's breach of contract claims against the Diocese Defendants are therefore dismissed.

### B.   Claims Against the RCA Defendants

While the RCA Defendants joined the Diocese Defendants' Motion to Dismiss, Plaintiff correctly notes that the RCA Defendants are not affiliated to a religious organization and they are instead a "private substance abuse counseling company." (Pl.'s Opp'n Br. 7.) Further, it does not appear that Plaintiff served in a ministerial capacity for the RCA Defendants. Accordingly, the Court agrees with Plaintiff that "the First Amendment privileges of the ministerial exception as outlined in *Hosanna-Tabor* [do] not apply" to the claims against the RCA Defendants. (*Id.*)

The RCA Defendants, however, contend that Plaintiff's Complaint must be dismissed because the allegations are merely "bald assertions or legal conclusions[.]" (RCA Defs.' Moving Br. 3, ECF No. 16) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (noting that while a party is not required to plead facts sufficient to prove its case under liberal notice pleading standards, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.")).) Indeed, there are only three paragraphs in the Complaint that are directed toward the RCA Defendants, which state generally that:

> 30.   Defendants Diocese and [Bishop] Stokes knowingly published false statements about [Plaintiff] to Defendant [RCA]

> and others with reckless disregard for the truth of [Plaintiff's] character and reputation.
>
> 31. After his dismissal from the Diocese, [Plaintiff] was subsequently hired by Defendant [RCA] as a "Spiritual Counselor" to assist men and women with substance abuse issues.
>
> 32. Defendants RCA and Reeves wrongfully discharged and discriminated against [Plaintiff] based on his race.

(Compl. ¶¶ 30-32.)

Here, Plaintiff's Complaint fails to satisfy the most basic requirements set forth under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(a)(2) (providing that a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."). Although the Court accepts that it is required to give Plaintiff's factual allegations "every favorable inference to be drawn therefrom," *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011), Plaintiff still holds the burden to allege sufficient facts to create a cognizable claim, *see Iqbal*, 556 U.S. at 678. Simply stated, Plaintiff has failed to plead enough factual information for the Court to even consider whether there is any causal nexus to support his claims against the RCA Defendants for discrimination/retaliation in violation of Section 1981, violation of the NJLAD, defamation, breach of contract, breach of the implied covenant of good faith and fair dealing, or wrongful discharge. (RCA Defs.' Moving Br. 4); *see also Morse*, 132 F.3d at 906 (noting that a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997) (same).

Consequently, Plaintiff has failed to state a claim against the RCA Defendants under Rule 12(b)(6). The claims are dismissed against the RCA Defendants without prejudice.

18

## IV. CONCLUSION

For the reasons set forth above, the Diocese Defendants' Motion to Dismiss (ECF No. 7) is granted. The dismissal is without prejudice and Plaintiff shall have thirty days to file an Amended Complaint that cures the deficiencies noted herein.[17] An appropriate Order accompanies this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[17] If Plaintiff does not file an amended pleading within that time, the matter will be dismissed with prejudice.