<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GIDEON A. UZOMECHINA,<br><br>       Plaintiff,<br><br>       v.<br><br>EPISCOPAL DIOCESE OF NEW JERSEY, *et al.*,<br><br>       Defendants. | Civil Action No. 23-2914 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

  This matter comes before the Court on two Motions to Dismiss Plaintiff Gideon A. Uzomechina's ("Plaintiff") Amended Complaint (ECF No. 21): (1) Defendants Episcopal Diocese of New Jersey (the "Diocese"), Bishop William Stokes ("Bishop Stokes"), and Canon Brian Jemmott's ("Canon Jemmott") (collectively, the "Diocese Defendants") Motion to Dismiss (ECF No. 22); and (2) Defendants Recovery Centers of America ("RCA") and Christopher Reeves's (collectively, the "RCA Defendants") Motion to Dismiss (ECF No. 23). Plaintiff opposed the Motions jointly (ECF No. 29) and the RCA Defendants replied (ECF No. 31). The Court has carefully considered the parties' submissions and decides this matter without oral argument under Local Civil Rule 78.1. For the reasons set forth below, the Court grants the Diocese Defendants' Motion to Dismiss Plaintiff's Section 1981 claim and declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

I.    **BACKGROUND**

    A.    **Factual Background**[1]

Plaintiff, a New Jersey resident of Nigerian origin, moved to the United States in 2008 to serve as a pastor in the Anglican Church. (Am. Compl. ¶¶ 1, 13, ECF No. 21.) At an unspecified time, Plaintiff entered an employment contract with the Diocese, the Trenton-based central office for the Episcopal Church in New Jersey, and its bishop, Bishop Stokes. (*Id.* ¶ 20.) While with the Diocese, Plaintiff served as a pastor for parishes in New Brunswick and Plainfield, New Jersey. (*Id.* ¶¶ 2, 15.)

Plaintiff and Bishop Stokes "worked well" together initially,[2] but at an unspecified time "Bishop Stokes sent his canon . . . to conspire with three of [Plaintiff's] vestry members . . . to create false allegations of sexual misconduct and theft of church funds against [Plaintiff]." (*Id.* ¶¶ 23-24.) Specifically, the Diocese induced two Nigerian men traveling in the United States to ask Plaintiff for support in filing asylum claims to remain in the country; Plaintiff refused to assist them.[3] (*Id.* ¶¶ 25-27.) Then, Bishop Stokes, the Nigerian men, and others "met privately," "deprive[d] [Plaintiff] of the opportunity to defend himself," and "conspired against" Plaintiff to falsely accuse him of sexual and financial misconduct because he is a black man. (*See id.* ¶¶ 28-29.) On these grounds, Plaintiff states he was victim of "racial discrimination" and was subject to a "hostile and racially motivated deprivation" of his rights. (*Id.* ¶ 30.)

---

[1] With respect to the instant motion, the Court accepts all factual allegations in the Amended Complaint as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[2] Bishop Stokes became the bishop for the Diocese in November 2013. (Am. Compl. ¶ 23.)

[3] The men asked Plaintiff to premise the asylum filing on their sexual orientation but "previously told [Plaintiff] they were not actually gay." (Am. Compl. ¶¶ 26-27.)

2

After being dismissed from the Diocese, Plaintiff was hired by RCA as a "Spiritual Counselor."[4] (*Id.* ¶ 37.) The Diocese Defendants interfered with his employment at RCA by "provid[ing] false statements with racial animus to RCA regarding" his alleged misconduct in his previous position.[5] (*Id.* ¶¶ 32-33.) Plaintiff was eventually discharged from RCA, who he claims treated him with hostility, targeted him unfairly, and discriminated against him when it discharged him based on his race. (*Id.* ¶¶ 37-39.) Plaintiff has experienced "extreme mental anguish, . . . emotional distress, loss of reputation[,] and [loss of the] ability to earn a livelihood" due to the foregoing events. (*Id.* ¶ 40.)

### B. Procedural History

This Court previously issued a Memorandum Opinion and Order dismissing Plaintiff's initial complaint. (Jan. 18, 2024 D.N.J. Mem. Op. ("Mem. Op."), ECF No. 19; Order, ECF No. 20; Compl., ECF No. 1).[6] Plaintiff then filed an Amended Complaint alleging three counts against the Diocese Defendants and two against the RCA Defendants. (Am. Compl. ¶¶ 41-76.) The Diocese Defendants moved to dismiss days later (ECF No. 22) and the RCA Defendants followed (ECF

---

[4] RCA is a drug rehabilitation resource center with sites in New Jersey. (Am. Compl. ¶ 5.) Plaintiff's previous duties there are described as "assist[ing] men and women with substance abuse issues." (*Id.* ¶ 37.)

[5] Plaintiff maintains that the false statements "continue to be published by the Diocese on its website" and are untrue. (Am. Compl. ¶¶ 34-36.)

[6] There, this Court granted the Diocese Defendants' Motion to Dismiss on all counts. (ECF No. 7.) In his initial complaint, Plaintiff alleged against both sets of Defendants: (1) racial discrimination and retaliation under 42 U.S.C. § 1981; (2) discrimination under the New Jersey Law Against Discrimination ("NJLAD"); (3) defamation; (4) breach of contract; (5) breach of the implied covenant of good faith and fair dealing; and (6) wrongful discharge in violation of New Jersey public policy. (Mem. Op. 3.)

3

No. 23). On April 16, 2024, Plaintiff timely filed a response in opposition to both motions (ECF No. 29), and the RCA Defendants replied (ECF No. 31).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2)[7]"requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). "Although we must accept the allegations in the complaint as true, we are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc) (internal quotations omitted); *Iqbal*, 556 U.S. at 678 (holding that courts may ignore bare statements that "the-defendant-unlawfully-harmed-me" (citing *Twombly*, 550 U.S. at 555)). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v.*

---

[7] Unless otherwise specified, all references to "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

4

*United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### III. DISCUSSION

For the reasons outlined below, Plaintiff's sole federal claim against the Diocese Defendants, his claim under 42 U.S.C. § 1981, is dismissed with prejudice. (Am. Compl. ¶¶ 41-62.) As such, this Court no longer has original jurisdiction over the remaining claims and declines to exercise supplemental jurisdiction over those claims. The Court elaborates on each of these findings in turn.

With respect to Plaintiff's sole federal claim under Section 1981, the Diocese Defendants argue that the "[ministerial] exception operates as an affirmative defense[8]" barring the claim. (Diocese Moving Br. *3, ECF No. 22-2 (alteration in original) (citation omitted).)[9] The Court agrees.

The ministerial exception is a recognition of "the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)). For decades, the Supreme Court has recognized that "hierarchical religious organizations [are permitted] to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over" such matters. *Serbian E. Orthodox Diocese for the U.S.*

---

[8] The "Third Circuit Rule allows affirmative defenses to be raised in a 12(b)(6) motion . . . [where] apparent on the face of the complaint," like here. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (internal quotations and citations omitted).

[9] Record cites using page numbers preceded by an asterisk refer to the numbers in ECF headers.

*& Canada v. Milivojevich*, 426 U.S. 696, 724 (1976). Later, the exemption was expanded to include "employment[-related] discrimination suit[s] brought on behalf of a [church-employed] minister." *Hosanna-Tabor*, 565 U.S. at 196; *see also Our Lady of Guadalupe*, 592 U.S. at 737 (describing the holding in *Hosanna-Tabor* as adopting the ministerial exception "to laws governing the employment relationship between a religious institution and certain key employees."). Accordingly, to assess whether the ministerial exception applies, the Court need only look to whether on the face of the Amended Complaint Plaintiff: (1) alleges that he was a "minister" employed by the Diocese Defendants; and (2) brings an employment-related discrimination claim against the Diocese Defendants.

First, Plaintiff clearly alleges he was a "minister" employed by the Diocese. (*See generally* Am. Compl.) The Amended Complaint affirms that Plaintiff "is a pastor" and "priest," holds religious degrees from seminaries, and "used spiritual principles" and "spirit-filled leadership" in his "positive ministry" to "at-risk young men."[10] (Am. Compl. ¶¶ 1, 14, 16-18; Pl.'s Opp'n Br. 5, ECF No. 29.) The Court, therefore, finds that Plaintiff's position is that of a "minister" for purposes of the First Amendment. *See Hosanna-Tabor*, 565 U.S. at 191-93 (considering a plaintiff's duties, religious education, ordained status, and whether one is held out as a minister in assessing their ministerial status and concluding that even a "teacher" may, under the appropriate circumstances, constitute a "minister" for purposes of the ministerial exception); *id.* at 199 n.1 (clarifying that a "pastor" or "priest" like that which Plaintiff alleges he previously was for the Diocese is a "minister" within the meaning of the ministerial exception where "many persons who clearly fall

---

[10] While their statements are not relied on in this posture, the Court notes that the Diocese Defendants agree with Plaintiff's view of his ministerial status. (*See* Diocese Moving Br. *8 & n.5 (elaborating that Plaintiff was not merely "dismissed" but "defrocked as an Episcopalian priest").)

within the 'ministerial' exception" include "Protestant ministers, Catholic priests, and Jewish rabbis"); *Morrissey-Berru*, 591 U.S. at 758 (calling "on courts to take all relevant circumstances into account . . . to determine whether each particular position implicated the fundamental purpose of the exception").

Second, having established Plaintiff was a minister while employed by the Diocese Defendants, the Court then must assess whether Plaintiff's Section 1981 claim is predicated on employment discrimination.[11] If so, the ministerial exception applies against the claim.

Importantly, Plaintiff himself describes his Section 1981 claim as a "discrimination and retaliation" claim against his employer.[12] (Pl.'s Opp'n Br. 8 ("Plaintiff . . . has . . . alleged sufficient facts to state a plausible discrimination and retaliation claim under 42 [U.S.C. §] 1981.") Moreover, the Amended Complaint is undeniably predicated on allegations related to his employment relationship with a church, i.e., the Diocese. (*See, e.g.*, Am. Compl. ¶ 22 (stating that the Diocese Defendants falsely charged Plaintiff "with misconduct" under the "Episcopal Cannons); ¶ 29 (alleging that the Diocese Defendants "conspired against him based on racially motivated false allegations" made internally by members of the Diocese). The employment relationship between Plaintiff and the Diocese Defendants, as governed by Section 1981, is exactly the sort of

---

[11] While federal courts often apply the ministerial exception at summary judgment, courts in this Circuit have applied the bar earlier in a litigation when the alleged facts permit. *See, e.g.*, *Petruska v. Gannon Univ.*, 462 F.3d 294, 302-03 (3d Cir. 2006); *Bethea v. Nation of Islam*, 248 F. App'x 331, 333 (3d Cir. 2007); *Simon v. Saint Dominic Acad.*, No. 19-21271, 2021 WL 6137512, at *2 (D.N.J. Dec. 29, 2021).

[12] Plaintiff routinely changes course in his Amended Complaint and briefing from claiming discrimination and/or retaliation under Section 1981 during his employment with the Diocese Defendants, (Pl.'s Opp'n Br. 8), to claiming a contractual violation or "racially motivated false allegations" that did not arise in the "employment discrimination context." (Pl.'s Opp'n Br. 11; Am. Compl. ¶¶ 30, 43.) It appears this may be in effort to subvert the applicability of the ministerial exception in this case.

relationship that the Supreme Court has cautioned is subject to the ministerial exception. *Our Lady of Guadalupe*, 591 U.S. at 767 (clarifying that there exists a "'ministerial exception' to laws governing the employment relationship between a religious institution and certain key employees."); *see also CBOCS W. v. Humphries*, 553 U.S. 442, 448 (2008) (noting Congress's focus on bolstering employment discrimination protections when revising 42 U.S.C. § 1981 so that it could be utilized to sustain employment discrimination claims); *Serbian E. Orthodox*, 426 U.S. at 724 ("[H]ierarchical religious organizations [are permitted] to establish their own rules and regulations for internal discipline and government.") Plaintiff's Section 1981 claim against the Diocese Defendants, despite his protestations to the contrary, is an employment discrimination claim subject to the ministerial exception where he alleges false statements were made against him pursuant to the "Episcopal Canons" which he alleges: (1) were racially motivated; (2) led to employment related consequences; and (3) were impermissible under his employment contract with the Diocese Defendants. (*See* Am. Compl. ¶¶ 22, 42, 43.)[13] As such, and because the ministerial exception is an affirmative defense, the Court dismisses Count I of Plaintiff's Amended Complaint with prejudice. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 112-13 (3d Cir. 2002) (holding that futility of amendment is a proper reason to deny leave to amend).

---

[13] As the Court noted in its prior Memorandum Opinion, Plaintiff's claim can also be viewed as an allegation of hostile work environment "within the penumbras of his Section 1981 claim." *Uzomechina v. Episcopal Diocese of N.J.*, No. 23-2914, 2024 WL 197752, at *3 n.11 (D.N.J. Jan. 18, 2024). But that phraseology does not allow Plaintiff to skirt the ministerial exception here because hostile work environment discrimination claims are simply a form of employment discrimination claim. *Koenke v. Saint Joseph's Univ.*, No. 19-4731, 2021 WL 75778, at *3 (E.D. Pa. Jan. 8, 2021), *appeal dismissed*, No. 21-1057, 2021 WL 6495772 at *1 (3d Cir. May 27, 2021) ("Plainly, hostile work environment discrimination claims are employment discrimination claims.").

In light of this finding, the Court also declines to exercise supplemental jurisdiction over the remaining state-law claims against the Diocese Defendants and the RCA Defendants. "Where[, as here,] the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added) (citations omitted); *accord. Garges v. People's Light & Theatre Co.*, 529 F. App'x 156, 163 (3d Cir. 2015); *Haqq v. Warren Cnty. Corr. Ctr.*, No. 21-17202, 2022 WL 2473440, at *2 (D.N.J. July 6, 2022). Here, Plaintiff's sole surviving federal claim was dismissed with prejudice and no principles of judicial economy, convenience, or fairness are present. As such, this Court must, and will, decline supplemental jurisdiction.[14] *W. Mifflin*, 45 F.3d at 788.

## IV.   **CONCLUSION**

For the reasons stated above, the Court grants the Diocese Defendants' and the RCA Defendants' Motions to Dismiss. An Order consistent with this Memorandum Opinion will be entered.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[14] Moreover, declining to exercise supplemental jurisdiction is also appropriate where, like here: (1) the remaining state-law claims raise a novel or complex state law issue; (2) state-law claims predominate over federal claims; and (3) all claims which the Court has original jurisdiction over have been dismissed. 28 U.S.C. § 1367(c).